# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 1:17-cr-00172-JRS-TAB |
| | ) | |
| THOMAS J. BUCK, | ) | |
| | ) | |
| Defendant. | ) | |

## RESPONSE IN OPPOSITION TO
## MOTION FOR COMPASSIONATE RELEASE

Defendant Thomas J. Buck is currently in the custody of the Federal Bureau of Prisons (BOP) at FCI Terre Haute in Terre Haute, Indiana. He filed a "Motion for Compassionate Release or Placement in Home Confinement," in which he asks the Court to release him from prison. (Dkt. No. 88, the "Motion".) The United States of America, by and through the undersigned attorney, respectfully submits this response in opposition to the Motion.

## BACKGROUND

### I.    Buck's Conviction and Sentence

Buck, a one-time veteran financial advisor for Merrill Lynch, pleaded guilty to securities fraud, in violation of 18 U.S.C. § 1348, for perpetrating a multi-year scheme to overcharge his clients. (Information, Dkt. No. 1; Plea Agreement, Dkt. No. 7; Presentence Report ("PSR"), Dkt. No. 41 ¶¶ 1-5; Judgment, Dkt. No. 83.) Between at least 2012-2015, Buck repeatedly lied to his clients—many of whom had been his clients for many years—about how much they were paying in commissions, artificially increased those commissions by making trades that clients did not authorize, and intentionally failed to offer clients cheaper options for paying for his services. Throughout this time, Merrill Lynch notified him repeatedly that his clients were paying too much in commissions. But Buck repeatedly assured Merrill Lynch's compliance personnel that he had

fully advised his clients of cheaper "fee-based" cost structures, and that his clients preferred to stay in the more-expensive commission-based structure anyway. Those assurances, too, were lies. (*See generally* PSR ¶¶ 6-13.)

Buck's sentencing hearing was contested. On the Guidelines, there was no dispute that the offense involved 10 or more victims, (*id.* ¶ 43), and that Buck held a position of special trust to his victims as their investment advisor, (*id.* ¶ 45). The parties did dispute, however, whether Buck's crime involved "sophisticated means" and whether the loss Buck caused his clients was greater than $1.5 million. Regarding loss, the government had argued and presented evidence that $2 million was a conservative estimate of loss. (Gov't Sent. Mem., Dkt. No. 65.)

After nearly eight hours of testimony and evidence, the Court found that Buck's crime did not involve sophisticated means, but nevertheless found that Buck caused his clients more than $1.5 million in loss. (Minute Entry, Dkt. Nos. 82 & 82-1.)

The resulting offense level was 26, which at criminal history category I produced an advisory Guidelines range of 63-78 months. (Dkt. No. 84.) The Court sentenced Buck to 40 months of imprisonment. (Dkt. No. 83.) The Court sentenced Buck below the guidelines on account of, among other things, his age, no criminal history, history of charity, forfeiture of his securities license, payment of restitution, and unlikeliness of recidivism. (Dkt. No. 84.)

## II.    Buck's Incarceration and His Medical Records from Prison

On March 21, 2019, Buck began serving his prison sentence at FCI Terre Haute in Terre Haute, Indiana. In prison, he has had no disciplinary issues, he has taken multiple educational courses, and his current work assignment is the puppy obedience program. *See* Exh. A, Individualized Reentry Plan – Program Overview for Inmate Thomas J. Buck, 15989-028

Attached as Exhibits B and C are Buck's medical records while in prison, with Exhibit B being the 2019 records and Exhibit C being the 2020 records. (In both exhibits, the records are presented in largely reverse chronological order.) The records show Buck has had several routine exams, including initial intake medical exams, (Exh. B at 9-29); dental exams, (Exh. B at 41-44, 57, Exh. C at 13-16); an eye exam (Exh. B at 4-6); and a routine medical exam, (Exh. C at 1-3).[1] He also had a chest x-ray, due to his age, which was also unremarkable. (Exh. B at 7, 59.)

At his initial exam, Buck provided his medical history and was examined by the medical staff. He stated he had a history of depression, gastrointestinal issues (acid reflux), and vision issues. (Exh. B at 18.) He also stated he had a history of "asthma with tendency for bronchitis" but that that he was "not on any inhalers." (Exh. B at 16.) The physical exam revealed nothing remarkable about his respiratory system. (Exh. B at 22 (within normal limits), 24 (lungs clear).) The "assessment and plan" regarding the asthma stated: "Pulmonary patient does not take inhalers routinely on the outside and only seems to be exacerbated when he is ill. We'll not enroll in chronic care unless he starts having problems. He may report to sick call if he does." (Exh. B at 28.) He was prescribed medication for depression and acid reflux. (Exh. B at 27.) Overall, the BOP medical staff determined that Buck had no work restrictions and was classified at "Care Level I," which reflects the lowest level for an inmate's need for medical care. (Exh. B at 39.)

Since then, records show that he had medical visits for vision issues on April 12, 2019; a cough on June 20, 2019, which he reported was improving; and diarrhea on December 3, 2019. (Exh. B at 35.) His medications have only consisted of contact solution, an anti-depressant, and a prescription for acid reflux, which has since been stopped. (*Id.*; Exh. C at 1-3, 12.)

---

[1] Buck has also had two routine psychological exams while in prison, the records for which were not submitted as exhibits because they were not relevant to Buck's claim for compassionate release. They have, however, been provided in discovery to Buck's counsel, and can be filed with the Court, should the Court desire to see them.

His prison medical records also contain correspondence between Buck and prison officials regarding medical issues. That correspondence, which took place during Buck's first two months in prison, concerned his anti-depression medication and eye/vision issues. (Exh. B at 48-52.)

## III.   Buck's Request for Compassionate Release

### A.   Buck's Requests to BOP

BOP records show that, on or about March 29, 2020, Buck sent an electronic message to prison officials requesting immediate release to home confinement. (Exh. D.) Then, on or about either April 10 or 14, 2020, FCI Terre Haute received a request for compassionate release from Buck's attorney containing medical documentation. (Exh. 4 to Buck's Motion, Dkt. No. 88-4 at 4 & 7.) The reasons set forth in each of these requests were similar to those presented in the Motion. The Warden has not yet responded to the requests.

### B.   Buck's Motion and Medical Records

#### 1.   Buck's Motion and Exhibits

On May 12, 2020, Buck's attorney timely filed the Motion in this Court[2]. (Dkt. No. 88.) Buck's Motion seeks immediate release based on his age (66) and medical history in light of the COVID-19 pandemic. In addition, the Motion attached six exhibits, which include his attorney's request to the prison (Dkt. No. 88-4), various DOJ letters and memos (Dkt. No. 88-3 & -5), news articles about the COVID-19 pandemic (Dkt. No. 88-6), and most relevant here, Buck's medical records (Dkt. No. 88-2).

---

[2] Buck exhausted his administrative remedies: 30 days had passed between Buck requesting release from FCI Terre Haute and his filing of the Motion. *See* 18 U.S.C. § 3582(c)(1)(A).

### 2. Letters from Two Physicians

Buck's medical records begin with recent letters from two of his treating physicians. (Dkt. No. 88-2 at 2 & 4.) Dr. James Rea stated that Buck has a history of "borderline elevated blood pressure," "GE reflux disease," "impaired fasting glucose," "anxiety/depression," and "a chronic history of asthma with some pulmonary issues." (*Id.* at 2.) Buck has previously been treated for asthma and suspected bronchitis, and has underwent an "exploratory thoracotomy for a granuloma," (*id.*), which according to the medical records occurred in or around 2006 to remove a "non-calcified nodule" caused by "histoplasmosis," a fungal infection[3], (*id.* at 54, 57-59). Dr. Rea concluded that "[t]he above issues place him at greater risk for pulmonary complications if he were to contract COVID-19." (*Id.* at 2.)

The second recent letter, from Dr. Thomas Slama, stated that in the late 1990s and early 2000s, Buck was diagnosed with "a selective acquired IgM deficiency that made him more prone to repeated respiratory tract infections," which Dr. Slama treated him for. (*Id.* at 4.) Selective IgM deficiency is an immune disorder in which a person has no or limited quantities of immunoglobulin M (IgM) antibodies, and as a result, "the body may have difficult fighting infections."[4]

Buck's medical records do not otherwise describe any treatment for selective IgM deficiency. The most recent medical record Buck submitted, dated March 20, 2019, states that he was "last assessed" for "selective immunoglobulin M deficiency" on August 28, 2012. (*Id.* at 8.) In a record dated August 27, 2012, Buck stated he had a history of selective IgM deficiency and a

---

[3] *See* Centers for Disease Control and Prevention, "Histoplasmosis," *available at* https://www.cdc.gov/fungal/diseases/histoplasmosis/index.html, last accessed May 22, 2020.

[4] *See* National Institutes of Health, Genetic and Rare Diseases Information Center, "Selective IgM deficiency," *available at* https://rarediseases.info.nih.gov/diseases/12547/selective-igm-deficiency, last accessed May 22, 2020

test was ordered. (*Id.* at 30-31 (record) & 169 (results for "immunofix, serum"[5] test were "Normal pattern. No monoclonal proteins detected".) These are the only other mentions of selective IgM deficiency in Buck's medical records.

### 3. Buck's Medical Records[6]

Overall, the medical records Buck submitted span the past approximately 15-20 years. The records show about as many doctor visits during that time period, including checkups and follow-ups, (*id.* at 7-9, 10-12, 19-21, 33-34); sick visits, (*id.* at 13-18, 22-23, 24-26, 27-28, 30-31); and visits to specialists or for various tests, (*id.* at 46-75). (Note: The records are presented largely in reverse chronological order.)

As of his most recent appointment before reporting to prison, on March 20, 2019, he was taking medications only for sleep, depression, and acid reflux. (*Id.* at 7-9.) Regarding his asthma, his doctor wrote, "uncomplicated" "well controlled. Not requiring inhaler at this time." (*Id.* at 8-9.)

The same was true at his wellness checkup on August 21, 2018. (*Id.* at 10-12.) He was taking medications only for depression and acid reflux, (*id.* at 10), and regarding asthma, his doctor wrote, "not needing inhaler," "uncomplicated," and "stable off inhalers at this time." (*Id.* at 11-12.)

Buck's records show he was last prescribed an inhaler "as needed" on August 22, 2017, when he presented with a persistent cough, fatigue, and clogged nostril. (*Id.* at 13-18.) A chest x-ray was "unremarkable," (*id.* at 15; *see also id.* at 51 ("no active cardio pulmonary disease")),

---

[5] U.S. National Library of Medicine, Medline Plus, "Immunofixation blood test," *available at* https://medlineplus.gov/ency/article/003543.htm, last accessed May 22, 2020.

[6] *See also* PSR ¶ 68 (summarizing medical records).

and on physical exam, his lungs presented "no wheezing, rales/crackles, or rhonci and breath sounds normal and good air movement," (*id.* at 14). Buck had been sick for several weeks, though, (*see id.* at 16-18 (sick visit on August 2, 2017 for similar symptoms)), and so had been prescribed the inhaler "as needed" and cough medicine with hydrocodone (tussionex pennkinetic[7]), (*id.* at 13 & 15).

Before that, the next sets of records are dated in 2014, and regarding asthma, they state: "Asthma-stable. Not requiring Ventolin HFA" (an inhaler)[8]. (*Id.* at 19-23.)

In March and April 2013, Buck presented with a "lingering deep cough" and was diagnosed with "acute bronchitis," "cough," "asthma with acute exacerbation," and fatigue. (*Id.* at 24-28.) His chest x-ray was negative. (*Id.* at 46.) He was prescribed Ventolin HFA and Advair Diskus 250-50[9] inhalers. (*Id.* at 25 & 28.)

In 2011 and 2012, Buck saw a respiratory specialist for issues pertaining to "intermittent cough, congestion, and shortness of breath." (*Id.* at 52-55.) On March 15, 2011, he was diagnosed with "adult-onset asthma aggravated by a respiratory infection" and prescribed an inhaler. (*Id.* at 54-55.) On March 8, 2012, he returned to the respiratory specialist following an illness and was prescribed an Advair inhaler. (*Id.* 52-53.)

---

[7] U.S. National Laboratory of Medicine, Daily Med, "Label: Tussionex Pennkinetic," *available at* https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=af2caf33-e587-4d80-9523-44e1b565aae2, last accessed May 22, 2020.

[8] *See* https://www.ventolin.com/, last accessed May 22, 2020 ("VENTOLIN HFA is a prescription inhaled medicine used to treat or prevent bronchospasm in people aged 4 years and older with reversible obstructive airway disease.").

[9] *See* https://www.advair.com/, last accessed May 22, 2020 ("ADVAIR DISKUS 250/50 is a twice-daily prescription medicine used long term to treat chronic obstructive pulmonary disease (COPD), including chronic bronchitis, emphysema, or both, for better breathing and fewer flare-ups.").

By August 27, 2012, the acute respiratory issues appear to have cleared when he made a visit to his regular doctor complaining of fatigue. (*Id.* at 30 (stating "Respiratory: no cough and no shortness of breath" and showing no asthma medications such as Advair or Ventolin).)

Lastly, during a wellness checkup on October 28, 2010, no respiratory issues were noted. (*Id.* at 33-34.)

## IV.    **COVID-19 and the Bureau of Prison's Response To It**

COVID-19 is a dangerous illness that poses grave risks to everyone in the world. In response to the pandemic, BOP has taken significant measures to protect the health of the inmates in its charge. *See* BOP, Updates to BOP COVID-19 Action Plan: Inmate Movement (Mar. 19, 2020), available at https://www.bop.gov/resources/news/20200319_covid19_update.jsp (explaining that "maintaining safety and security of [BOP] institutions is [BOP's] highest priority").

BOP has developed and implemented a six-phase "Coronavirus (COVID-19) Action Plan" to minimize the risk of COVID-19 transmission into and inside its facilities. Phase Six, which began on April 13, 2020 and is currently in effect, requires that all inmates in every BOP institution be secured in their assigned cells/quarters for a period of at least 14 days, in order to stop any spread of the disease.[10] Only limited group gathering is allowed, with attention to social distancing to the extent possible to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has severely limited the movement of inmates and detainees among its facilities. Though there will be exceptions for medical treatment and similar exigencies, this step as well will limit transmissions.

---

[10] For more information, see BOP, "BOP Implementing Modified Operations," *at* https://www.bop.gov/coronavirus/covid19_status.jsp, last accessed May 26, 2020.

All staff and inmates have been and will continue to be issued an appropriate face covering and strongly encouraged to wear the face covering when in public areas when social distancing cannot be achieved.

Every newly admitted inmate is screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, in areas with sustained community transmission and at medical centers, all staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with a stuffy or runny nose can be placed on leave by a medical officer.

Contractor access to BOP facilities is restricted to only those performing essential services (e.g. medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

Social and legal visits were stopped as of March 13, 2020, and remain suspended to limit the number of people entering the facility and interacting with inmates. In order to ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended. Legal visits will be permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols in place for prison staff, contractors, and visitors.[11]

---

[11] Further details and updates of BOP's modified operations are available to the public on the BOP website at a

In addition, in an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is exercising greater authority to designate inmates for home confinement.   On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement.   That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, *see* 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g).   Congress has also acted to enhance BOP's flexibility to respond to the pandemic. Under the Coronavirus Aid, Relief, and Economic Security Act, enacted on March 27, 2020, BOP may "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" if the Attorney General finds that emergency conditions will materially affect the functioning of BOP.   Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note).   As of this filing, BOP has transferred 3,311 inmates to home confinement an increase of 116%.[12]

Taken together, all of these measures are designed to mitigate sharply the risks of COVID-19 transmission in a BOP institution.   BOP has pledged to continue monitoring the pandemic and to adjust its practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

As of the time of this filing, FCI Terre Haute has <u>zero</u> confirmed COVID-19 cases.[13]

---

regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

[12] *See* BOP, "COVID-19 Home Confinement Information," *available at* https://www.bop.gov/coronavirus/, last accessed May 27, 2020.

[13] While the United States Penitentiary in Terre Haute appears to have had three inmates test positive for COVID-19,

**DISCUSSION**

Buck's Motion seeks immediate release from prison under both (1) Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), 18 U.S.C. § 3624(c); and (2) the First Step Act, 18 U.S.C. § 3582(c)(1)(A)(i). The Court should deny it for several reasons.

First, as courts in this district have held, section 3624 (the CARES Act) confers authority only on the BOP, and not the courts, to authorize a term of imprisonment to be served on home confinement. Neither the CARES Act, nor any other provision of law, provides Buck a basis to ask a court to designate where he serves his prison sentence.

Second, under section 3582 (compassionate release), Buck's claim for release likewise lacks merit. At the outset, his plea agreement waived his right to seek relief under section 3582, with one exception not applicable here.

Waiver notwithstanding, Buck has not established an "extraordinary and compelling reason" for his immediate release from prison. His medical conditions, as described in both prison records and the medical records he filed, do not rise to that level, even in light of COVID-19. He has recently been treated only for depression and acid reflux, neither of which pose any greater risk in light of COVID-19. His asthma is intermittent and well-controlled, not "moderate" or "severe." And, his medical records do not otherwise show that Buck presently suffers from a "terminal illness," an illness that "substantially diminishes the ability of the defendant to provide self-care" in prison, or even a "serious underlying medical condition" that has been linked to risk of severe illness if he contracts COVID-19.

---

FCI Terre Haute (where Buck is incarcerated) has had no positive tests. See https://www.bop.gov/coronavirus/, last accessed May 27, 2020; *see also United States v. Street*, 1:18-cr-00274-JMS-DLP, Dkt. No. 52, at 7 n.5 (S.D. Ind. May 21, 2020).

Nor would his immediate release fulfill the goals of sentencing under 18 U.S.C. § 3553(a), as it must under section 3582. Buck perpetrated a $2 million fraud over several years on his trusting, long-time financial advisory clients. His immediate release would mean he served only 14 months, only 22% of the low-end of the advisory Guidelines range for his conduct of 63-78 months. Releasing Buck now would not sufficiently reflect the seriousness of his offense, promote respect for the law, or provide just punishment for his conduct.

## I.     The CARES Act Does Not Afford Judicial Relief

Courts in this district, and elsewhere, have rightly determined that the CARES Act expands the powers of only of the BOP to authorize home confinement, not the courts:

> Prerelease custody is governed by 18 U.S.C. § 3624(c). It allows for the possibility of home confinement. *Id.* Under the plain language of the statute, however, "the Bureau of Prisons, not the Court, has the sole authority to prescribe home confinement post-incarceration [under 18 U.S.C. § 3624(c)]." *United States v. Rodriguez*, ___ F. Supp. 3d. ___, No. 16-CR-167(LAP), 2020 WL 1866040, at *4 (S.D.N.Y. Apr. 14, 2020); *see also United States v. Wilson*, 503 U.S. 329, 335 (1992) ("After a district court sentences a federal offender, the Attorney General, acting through the BOP, has the responsibility for administering the sentence."). The crisis caused by the COVID-19 pandemic does not create an exception to the general rule that the courts lack authority to determine whether prisoners should be placed in home confinement. The recently enacted Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, 134 Stat. 281 (2020), allows a COVID-19-related exception to the normal time limits imposed on home confinement by providing, "During the covered emergency period, if the Attorney General finds that emergency conditions will materially affect the functioning of the [BOP], the Director of the [BOP] may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement under the first sentence of [18 U.S.C. § 3624(c)(2)], as the Director deems appropriate." 134 Stat. at 516 (CARES Act § 12003(b)(2)). This provision expands only the powers of the Attorney General and the Director of the BOP, not the courts.

*United States v. Davis*, No. 1:17-cr-00062-RLY-RML, Dkt. No. 262 (S.D. Ind. May 1, 2020); *see also United States v. Johnson*, No. 1:99-cr-00059-JMS-DML-6, Dkt. No. 299 (S.D. Ind. Apr. 16, 2020) (same).

In sum, federal law delegates the authority to designate an inmate's place of confinement to the BOP, and the BOP alone. Buck's claim for immediate release cannot proceed under the CARES Act.

## II. Buck Expressly Waived the Right to File a Section 3582 Motion

Buck also requests immediate release under 18 U.S.C. § 3582(c)(1)(A). However, before getting to the merits, the Court should deny Buck's Motion because he expressly waived the right to file it as a condition of his plea agreement. Specifically, he agreed not to seek to "modify" his sentence "*in any proceeding*, including . . . under 18 U.S.C. § 3582[.]" Dkt. No. 7 at ¶ 37 (emphasis added). Thus, in exchange for concessions made by the government—which included a Fed. R. Crim. P. 11(c)(1)(C) provision restricting the government from arguing for, and the Court from finding, an amount of loss greater than $2 million or any amount of a fine, *id.* ¶ 13—the government sought finality as to Buck's sentence.

The plea agreement includes a narrow exception to Buck's 3582 waiver for retroactive Guidelines amendments that "lower the guideline range that pertains to the Defendant's offense(s)." *Id.* That is not applicable here. And moreover, the fact that the narrow exception exists at all further underscores that the parties struck a bargain that sought to put the matter of Buck's sentence to rest.

Absent a showing that the plea agreement was involuntary or otherwise invalid, such a waiver "is valid, and must be enforced[.]" *United States v. Hare*, 269 F.3d 859, 860 (7th Cir. 2001); *see also Nunez v. United States*, 546 F.3d 450, 455 (7th Cir. 2008) ("[A] waiver [of appeal or of post-conviction relief rights] stands or falls with the plea bargain of which it is a part."). The First Step Act did not alter that well-settled rule. *See, e.g.*, *United States v. Eidson*, No. 17-cr-00490-SI, 2019 WL 3767570 at *2 (N.D. Cal. Aug. 9, 2019) (noting that because defendant "made

no argument that th[e] waiver was not knowingly and voluntarily made[,]" it was "enforceable" to bar his motion for compassionate release under Section 3582). *But see United States v. Burrill*, No. 17-CR-00491-RS-1, 2020 WL 1846788 at *2 (N.D. Cal. Apr. 10, 2020) (concluding defendant's waiver of 3582 rights, which predated First Step Act, did not include waiver of right of defendant to file motion after 30 days warden received request (as opposed to BOP filing motion), which was added by First Step Act).

In his Motion, Buck did not discuss with the waiver in his plea agreement, or how it was not knowing and voluntary. That is because it was knowing and voluntary. Accordingly, the Court should enforce the waiver and dismiss the Motion.

## III.   <u>Buck's Motion under Section 3582 Relief Fails on the Merits</u>

Buck's waiver notwithstanding, his claim under section 3582 fails on the merits for two reasons: (a) he cannot establish an "extraordinary and compelling reason" for release, and (b) his release after only 14 months cannot be squared with section 3553(a).

### A.   <u>Applicable Legal Standard</u>

A federal court generally "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). However, as this Court is well-aware, 18 U.S.C. § 3582(c)(1)(A)(i) affords the Court authority to reduce a term of imprisonment if certain criteria are met:

> [T]he court . . . may reduce the term of imprisonment . . . [1] after considering the factors set forth in section 3553(a) to the extent that they are applicable, [2] if it finds that extraordinary and compelling reasons warrant such a reduction . . . and [3] that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

18 U.S.C. § 3582(c)(1)(A)(i) (insertions added); *see United States v. Curry*, 2:06-cr-00011-JRS-CMM, Dkt. No. 77, at 7-8 (S.D. Ind. May 21, 2020).

Buck bears the burden of proving these criteria are met. *See United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016); *United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014). And, as such terminology makes clear, compassionate release should be granted only in rare, indeed "extraordinary," cases.[14]

By statute, the definition of "extraordinary and compelling reasons" is provided by the U.S. Sentencing Commission's policy statements, which "include[ ] the criteria to be applied and a list of specific examples." 28 U.S.C. § 994(t) (also stating that "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason"). *See also Dillon v. United States*, 560 U.S. 817, 827 (2010) (noting that where 18 U.S.C. § 3582(c)(2) permits a sentencing reduction based on a retroactive guideline amendment, "if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission," the Commission's pertinent policy statements are binding on the court).[15]

The relevant Sentencing Commission policy statement is at U.S.S.G. § 1B1.13. The term "extraordinary and compelling reasons" is defined in Application Note 1 to that Guideline:

(A)  Medical Condition of the Defendant.—

    (i)  The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time

---

[14] *E.g.*, *United States v. Willis*, 382 F. Supp. 3d 1185, 1188–89 (D.N.M. 2019) (quoting *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. May 9, 2019) and citing *United States v. Clark*, No. 3:13-cr-163-FDW-1, 2019 WL 1052020 at *3 (W.D.N.C. Mar. 5, 2019); *United States v. Gutierrez*, No. CR 05-0217-RB, 2019 WL 1472320 at *2 (D.N.M. Apr. 3, 2019); *United States v. Casey*, No. 1:06-cr-00071, 2019 WL 1987311 at *1 (W.D. Va. May 6, 2019) (all denying this "extraordinary" relief)).

[15] The policy statement refers only to motions filed by the BOP Director. That is because the policy statement was last amended on November 1, 2018, and until the enactment of the First Step Act on December 21, 2018, defendants were not entitled to file motions under § 3582(c). *See* First Step Act of 2018, Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239; *cf.* 18 U.S.C. § 3582(c) (2012). In light of the statutory command that any sentence reduction be "consistent with applicable policy statements issued by the Sentencing Commission," § 3582(c)(1)(A)(ii), and the lack of any plausible reason to treat motions filed by defendants differently from motions filed by BOP, the policy statement applies to motions filed by defendants as well.

period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

    (ii)    The defendant is—

        (I)    suffering from a serious physical or medical condition,

        (II)    suffering from a serious functional or cognitive impairment, or

        (III)    experiencing deteriorating physical or mental health because of the aging process,

        that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B)    Age of the Defendant.—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C)    Family Circumstances.—

    (i)    The death or incapacitation of the caregiver of the defendant's minor child or minor children.

    (ii)    The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(D)    Other Reasons.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).[16]

Additionally, the policy statement, like 18 U.S.C. § 3582(c)(1)(A) itself, requires the Court to consider "the factors set forth in 18 U.S.C. § 3553(a), to the extent they are applicable."

---

[16] Consistent with Application Note 1(D) (the "catch all" provision), BOP promulgated Program Statement 5050.50, available at https://www.bop.gov/policy/progstat/5050_050_EN.pdf, was amended effective January 17, 2019, to set forth its evaluation criteria.

U.S.S.G. § 1B1.13.   Further, the policy statement requires the Court to consider whether the defendant is "a danger to the safety of any other person or to the community, as provided in 18 US.C. § 3142(g)," which governs pretrial detention.   *Id.* § 1B1.13(b).

### B. Buck Has Not Shown an "Extraordinary And Compelling Reason" Why He Should Be Released

Buck's Motion appears to argue that his medical history, in light of the COVID-19 pandemic, constitutes an "extraordinary and compelling reason" to justify his release under U.S.S.G. § 1B1.13 app. n. 1(A).   Although he is at least 65 years old, Buck does not appear to be claiming that he is "experiencing a serious deterioration in physical or mental health because of the aging process," or that he has served more than 75% of his sentence.[17]   *Id.* § 1B1.13 app. n. 1(B).   Nor does he claim to be "suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory)." *Id.* § 1B1.13 app. n. 1(A)(i).   Instead, Buck's claim appears to be that he has medical conditions that, in light of the risk of COVID-19, "substantially diminish[ ] the ability of the defendant to provide self-care within the environment of a correctional facility." *See* U.S.S.G. § 1B1.13 app. n. 1(A)(ii)(I).   Specifically, Buck contends that he has had "a chronic history of asthma and pulmonary issues," "been treated for suspected bronchitis," "had a selective acquired IgM deficiency that has rendered him prone to repeated respiratory tract infections," and has previously had surgery to remove a noncancerous module from his lung.[18]   (Buck's Motion, Dkt. No. 88 ¶ 5.)

---

[17] Furthermore, being over age 65, alone, is insufficient to require release, especially when the defendant has served less than 75% of his sentence.   *See United States v. Hiller*, No. CR ELH-18-0389, 2020 WL 2041673, at *3 (D. Md. Apr. 28, 2020).

[18] As the PSR makes clear, Buck's medical history has not materially changed since the Court sentenced him 15 months ago.   PSR ¶ 68.   *See United States v. Gill*, No. 2:06-CR-00312-MCE, 2020 WL 2084810, at *3 (E.D. Cal. Apr. 30, 2020) ("[T]here is nothing in the record to establish that Defendant's condition has deteriorated to the point he is unable to care for himself. To the contrary, the Court's review of the record indicates Defendant continues to suffer from the same medical conditions now as he did when he committed the massive frauds underlying his

This history does not constitute an "extraordinary and compelling reason" to release Buck early from prison. To be clear, the government does not dispute the veracity of Buck's medical records. Rather, these records do not substantiate that Buck suffers from health conditions that, even in light of COVID-19, constitute an "extraordinary and compelling reason" for his release.

Specifically, Buck does not have any respiratory or other illness that poses a significant risk to his health, even if he contracted COVID-19—which poses a risk to everyone's health. *See United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) ("[T]he mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread.").

Buck's prison medical records—the most recent records available in terms of Buck's health—show no health issues over the past 14 months, save for a cough at one point which improved. (Exh. B at 35.) He is "not on any inhalers," (Exh. B at 16); his physical exam revealed nothing remarkable about his respiratory system, (Exh. B at 22, 24); his chest x-ray was unremarkable, (Exh. B. at 7, 59); and he has no work restrictions and was classified at "Care Level I," (Exh. B at 39).

Similarly, his personal medical records show that during the year and a half before he reported to prison, he was being treated only for sleep issues, depression, and acid reflux. (Dkt. No. 88-2 at 7-12.) At doctor's visits in 2018 and 2019, Buck's doctor wrote that his asthma was

---

conviction, supporting the conclusion that those afflictions do not significantly affect Defendant's ability to function.").

"uncomplicated" "well controlled. Not requiring inhaler at this time." (*Id.* at 8-9; *see also id.* at 11-12 ("not needing inhaler," "[asthma] uncomplicated," and "stable off inhalers at this time").)

Overall, in the past 10 years, Buck's medical records show that he was sick with a cough and other common cold/flu-like symptoms on only 3-4 occasions. (*Id.* at 13-34.) He was prescribed an inhaler, with the most recent being in 2017, though it was to be used "as needed." (*Id.* at 13-18; *see also* 19-30, 52-55.) Otherwise, Buck has remained in good health over the past decade.

With respect to COVID-19, Buck does not have any of the "serious underlying medical conditions" that the U.S. Centers for Disease Control ("CDC") has identified as placing individuals "at higher risk for severe illness from COVID-19."[19] The CDC-identified risk factors that might pertain to Buck based on his medical records are "asthma (moderate-to-severe)," "immunocompromised," and "chronic lung disease." However, Buck's records show that he does not fall into any of those three categories.

***Chronic Lung Disease[20].*** The CDC's guidance lists examples of the types of diseases that fit within this category: "chronic obstructive pulmonary disease (COPD) (including emphysema and chronic bronchitis), idiopathic pulmonary fibrosis and cystic fibrosis." Buck has never been diagnosed with any of those conditions. (The surgery to remove a noncancerous nodule on his lung was due to an acute fungal infection, not the product of a chronic lung disease. *See supra* at 6 & n.3.) Indeed, his medical records lack any reference to any present "lung disease," aside from intermittent asthma (which is addressed below). Buck's medical records

---

[19] CDC, "Groups at Higher Risk for Severe Illness," *at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html, last accessed May 26, 2020.

[20] *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html#chronic-lung-disease, last accessed May 26, 2020.

show that, during the past 10 years, Buck has seen the doctor for respiratory-related issues only a handful of times.  (Dkt. No. 88-2 at 7-34.)  This is not indicative of the CDC risk factor for chronic lung disease.

*Immunocompromised*[21]*.*  Buck's records show that, in the late 1990s or early 2000s, he was diagnosed with "selective IgM deficiency," which is an immune system disorder.  *See supra* at 5 & n.4.  However, Buck's medical records, which span 15-20 years, show that he has not been treated for this condition in that timeframe.  Moreover, the results of a test for this condition in August of 2012—which appears to have been requested only because Buck stated he had a history of selective IgM deficiency and not because of any active disease process—showed a "normal pattern."  (Dkt. No. 88-2 at 30-31 & 169.)  Thus, without more, Buck has not established that he still suffers from "selective IgM deficiency" or that his condition rises to the level outlined in the CDC risk factor for "immunocompromised" individuals.

*Asthma (Moderate-to-Severe)* [22] *.*  The CDC has identified that "*moderate-to-severe* asthma may put people at higher risk for severe illness from COVID-19."  *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/asthma.html  (emphasis added).  Asthma is classified as "moderate" or "severe" if symptoms occur on a daily basis or throughout the day.  (Exh. E at 5[23].)  Even "mild" asthma occurs more than twice a week.  *Id.*

---

[21] *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html#immunocompromised, last accessed May 26, 2020.

[22] *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html#asthma, last accessed May 26, 2020..

[23] U.S. National Institutes of Health, National Heart, Lung, and Blood Institute, "Asthma Care Quick Reference: Diagnosing and Managing Asthma," 2012, *at* https://www.nhlbi.nih.gov/files/docs/guidelines/asthma_qrg.pdf, last accessed May 26, 2020.

Buck's symptoms, by contrast, appear to occur rarely. At most, Buck's medical records show that his asthma is "intermittent." *See* Exh. E at 5. As noted, Buck has not used an inhaler for several years. And, he has seen the doctor for respiratory issues only a handful of times throughout the past decade. His last use of an inhaler, in 2017, was only "as needed" in relation to what appears to have been cold/flu-like symptoms. (Dkt. No. 88-2 at 13-18.) And, before that, the last time he was prescribed an inhaler was in 2013. (*Id.* at 24-28. *See also id.* 19-23 (records from 2014 stating "Asthma-stable. Not requiring Ventolin HFA [inhaler]"). Indeed, the BOP medical staff concluded that Buck's health placed no restrictions on his ability to work while in prison, and classified him as requiring the lowest level of care of inmates in the facility. (Exh. B at 39; *see also* Exh. E at 5 ("intermittent" or "mild" asthma places no limitation or minor limitation on individual's "normal activity")).

Accordingly, Buck's asthma does not pose a risk for severe illness with COVID-19, and therefore does not constitute an "extraordinary and compelling reason" for release under section 3582. *See, e.g.*, *Street*, No. 1:18-cr-00274-JMS-DLP, Dkt. No. 52, at 6-7 (S.D. Ind. May 21, 2020) ([T[here is no evidence that his asthma is moderate-to-severe. Instead, the medical records show that his asthma is mild. For example, on January 10, 2020, Mr. Street told a health care provider that he "needs to use [his inhaler] as needed every once in awhile." [cite] (prescription for Albuterol inhaler to be used "as needed"). Mr. Street's medical records also show that, other than a refill for his inhaler, he has not had any issues with his asthma in 2020. (internal citations omitted)); *United States v. Miller*, No. 18-CR-30034, 2020 WL 2093370, at *2 (C.D. Ill. May 1, 2020) (denying release when "medical records state that Defendant's asthma is controlled with medication"); *United States v. Godofsky*, No. CR 5:16-59-KKC-1, 2020 WL 2188047, at *2 (E.D. Ky. May 6, 2020) (denying release even where defendant has "has high blood pressure, high cholesterol, asthma, and is currently taking medications that weaken his immune system" because defendant has not shown

terminal illness or inability to self-care); *United States v. Ramos*, No. 14 CR. 484 (LGS), 2020 WL 1685812, at *2 (S.D.N.Y. Apr. 7, 2020) (denying release where "Defendant's medical records show no new asthma attacks, and that his asthma is being treated by the BOP").

*  *  *

In sum, the government is mindful of the impact COVID-19 is having on people throughout the world, the public health risks it poses, and the anxiety it causes.  That is true in BOP institutions, and for inmates like Buck, who have had minor health issues in the past.  That said, COVID-19 is not the jailer's keys for every federal prisoner with some history of conditions that may make them more susceptible to the disease.  *See United States v. Broomfield*, No. 17-CR-30018, 2020 WL 2200432, at *3 (C.D. Ill. May 6, 2020).

Release from prison requires a showing of "extraordinary and compelling reasons."  Here, Buck's medical records fall short.  He does not now, nor has he ever, suffered from a "terminal illness" or "a serious physical or medical condition that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover."  U.S.S.G. § 1B1.13 app. n. 1(A)(i) & (ii)(I).

The risk of contracting COVID-19 does not change that.  That risk is present if Buck is released.  Perhaps more so.  Indianapolis, Indiana, where Buck requests to be released, has over 9,000 confirmed cases and over 500 deaths from the illness.[24]  Meanwhile, FCI Terre Haute, where Buck is now—which has adopted rigorous controls to prevent and control the virus's spread—has zero cases and zero deaths.  *See supra* at 8-11.

In light of these facts, and the lack of a serious medical condition, Buck fails to establish an extraordinary and compelling reason for immediate release from prison.  *See, e.g.*, *United*

---

[24] *See* Indiana State Department of Health, "County Distributions," *available at* https://www.coronavirus.in.gov/, last accessed May 26, 2020.

*States v. Gold*, No. 15 CR 330, 2020 WL 2197839, at *1 (N.D. Ill. May 6, 2020) (denying release because "there have been no confirmed cases of COVID-19 [at FCI Terre Haute]" and the defendant "has not persuaded me either that he is especially likely to become seriously ill with COVID-19, or that FCI Terre Haute would be unable to meet his medical needs if he does contract the illness"); *Broomfield*, 2020 WL 2200432, at *3 ("As of today, at USP Canaan, the facility where Defendant is housed, there is only one confirmed case staff member case of COVID-19 and zero confirmed inmate cases. According to the Government, the BOP has implemented rigorous procedures designed to prevent the virus from spreading through its facilities."); *Hiller*, 2020 WL 2041673, at *3-4 (denying release, in part, because of BOP's efforts to prevent and contain COVID-19 spread at defendant's facility); *United States v. Shah*, No. 16-20457, 2020 WL 1934930, at *2 (E.D. Mich. Apr. 22, 2020) (denying "extreme remedy" of release because defendant's diabetes and hypertension do not constitute extraordinary and compelling reasons where "[t]here are currently no confirmed cases of COVID-19 in Defendant's facility. The BOP has instituted strict precautions throughout the federal prison system, including shelter-in-place protocols, screening and quarantining all newly arriving detainees, and isolating until medically cleared all symptomatic detainees").

### C.     Buck's Immediate Release Cannot Be Squared with Section 3553(a)

Even if Buck's medical history established an extraordinary and compelling reason, Buck should remain in prison because his having served only 14 months is insufficient to effectuate the purposes of sentencing outlined in 18 U.S.C. § 3553(a). *See Curry*, 2:06-cr-00011-JRS-CMM, Dkt. No. 77, at 9 (finding an extraordinary and compelling reason "does not, however, end the analysis because the statute also directs the Court to consider the sentencing factors in 18 U.S.C. § 3553(a)"). To be clear, the government does not contend that Buck is dangerous or poses a high

risk of recidivism. Rather, is it that 14 months does not appropriately capture "the nature and circumstances of the offense" and the need for the sentence imposed "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." *Id.* § 3553(a)(1) & (2)(A).

Buck was a 30-year veteran financial advisor for Merrill Lynch. Many of his clients had trusted their money with him for decades. In the last stages of his career, however, Buck chose to abuse their trust and the trust of his long-time firm. As Merrill Lynch rolled out more client-friendly cost structures, Buck resisted. He preferred to keep many of his clients in the traditional "commission" cost structure, as opposed to the new "fixed fee" based cost structure. His motive for doing so, as this criminal case revealed, was greed. Many of his clients paid more under the commission-based structure—some of them hundreds of thousands of dollars more. But, when they asked about the new fee-based structure, he lied about how much he was charging them and convinced them it made sense to stick with commissions. That is, if he said anything at all. In many cases, he never told his clients the fee-based structure would save them money—despite re-affirming time and again to Merrill Lynch that he had done that. (*See* Dkt. Nos. 1 (Information); 7 at ¶¶ 23-25 (stipulation regarding factual basis); 41 at ¶¶ 6-13 (PSR offense conduct); 65 and exhibits (Govt. Sentencing Memo); 82-1 (court minutes as to exhibits and witnesses at sentencing.) As a result, as the Court found at sentencing, Buck stole at least $1.5 million from his clients. (Minute Entry, Dkt. Nos. 82.)

Buck was sentenced to 40 months of imprisonment. His release after only 14 months would constitute only 35% of his full-term sentence, or 42% of his sentence with good-time credit. Such a small amount of time is not commensurate with the level of fraud Buck perpetrated, or the way he abused the trust of his long-time clients to perpetrate it. *See United States v. Willis*, 382

F. Supp. 3d 1185, 1189 (D.N.M. 2019) (denying request for compassionate release to defendant who was blind and wheelchair-bound because "[r]eleasing defendant after only five months would minimize both the impact on the victims and the extent of the fraud," particularly "in the context of white collar crime"); *Gold*, 2020 WL 2197839, at *2 ("While it may be that Mr. Gold is no longer in a position to prey upon individuals who entrusted him with their life savings, the term of incarceration I imposed represents the sentence I deemed adequate to punish him for the financial ruin he caused his victims and to promote respect for the law, among other factors. I am not convinced that ordering his immediate release with nearly half of that sentence remaining (the BOP lists his projected release date as June 11, 2022) is justified by his claim of rehabilitation or his ability to return to his previous home upon release.").

Perhaps the best indicator of the unreasonableness of Buck's request for release is his advisory Guidelines range. It was 63-78 months. That range, reflecting an offense level 26 at criminal history category I, appropriately captured the nature and circumstances of Buck's fraud, including the over $1.5 million he stole (U.S.S.G. § 2B1.1(b)(1)(I)), the large number of individual victims (U.S.S.G. § 2B1.1(b)(2)(A)(i)), and the fact that he abused his position of special trust as a financial advisor to perpetrate his scheme (USSG §2B1.1(b)(19)(A)(iii)). Serving just 14 months for a crime of the magnitude that Buck committed would not sufficiently reflect the seriousness of the offense, promote respect for the law, or provide just punishment.

Accordingly, the Court should deny Buck's claim on 3553(a) grounds as well.

## CONCLUSION

For the foregoing reasons, the Court should deny Buck's Motion for Compassionate

Release or Placement in Home Confinement Release (Dkt. No. 88) with prejudice.

Respectfully submitted,

JOSH J. MINKLER
United States Attorney

Date:   May 27, 2020      By:   /s/ Nicholas J. Linder
                                              Nicholas J. Linder
                                              Assistant United States Attorney
                                              United States Attorney's Office
                                              10 West Market Street, Suite 2100
                                              Indianapolis, IN 46204-3048
                                              Telephone: 317-226-6333
                                              Email:   nick.linder@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 27, 2020, a copy of the foregoing was filed electronically.

Notice and service of this filing will be made on all ECF-registered counsel by operation of the

court's electronic filing system.   Parties may access this filing through the court's system.

Patrick A. Shoulders
Ziemer Stayman Weitzel & Shoulders, LLP
20 NW First Street, 9th Floor
PO Box 916
Evansville, IN 47706-0916
*Counsel for Thomas J. Buck*

/s/ Nicholas J. Linder
Nicholas J. Linder
Assistant United States Attorney
10 West Market Street, Suite 2100
Indianapolis, IN    46204-3048
Telephone:   317-226-6333
Fax:   317-229-6125
Email:   nick.linder@usdoj.gov